# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CAMILLE HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 CV 9488 |
| | ) | |
| T.J. MAXX OF IL, LLC, | ) | Hon. Marvin E. Aspen |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

In her amended complaint, Plaintiff Camille Hall alleges that Defendant T.J. Maxx of Illinois, LLC ("T.J. Maxx") wrongfully discharged her in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-102. Presently before us is T.J. Maxx's motion for summary judgment, alleging that Hall's claim fails as a matter of law. For the reasons discussed below, we grant T.J. Maxx's motion for summary judgment because we find that there is no genuine dispute of material fact that (1) Hall was discharged for reasons other than her gender and sexual orientation, namely, for violating T.J. Maxx's customer apprehension guidelines, and (2) similarly-situated individuals were not treated more favorably.

## BACKGROUND[1]

In September 2007, Hall began working for a T.J. Maxx-related entity in California. (Def.'s SOF ¶ 7.) After she was transferred to T.J. Maxx of Illinois in Naperville in December 2008, she was employed as a lead loss prevention detective. (*Id*.) Hall's District Loss

---

[1] T.J. Maxx argues that we should disregard Hall's facts because she failed to comply with Local Rule 56.1. (Def.'s Resp. to Pl.'s SOF, Reply at 2–3.) To the extent that Hall offers evidentiary support with accurate citations to the record, however, we rely on said facts.

1

Prevention Manager and immediate supervisor was David Bell, who had interviewed Hall and offered her the position in Illinois. (*Id.* ¶ 8.) Bell's immediate supervisor was Regional Loss Prevention Manager, Michael Friske. (*Id.* ¶ 9.)

As a lead loss prevention detective, Hall was responsible for, among other things, observing and deterring shoplifting. (*Id.* ¶ 10.) Hall understood that she was required to comply with the Shoplifter Apprehension Policy and the Expanded Guidelines and that she could be terminated if she failed to comply with these policies. (*Id.* ¶¶ 21–22.) T.J. Maxx's Expanded Guidelines require that before any apprehension may be made of a customer entering a restroom or dressing room, a loss prevention detective must meet not only the first four elements of the Shoplifter Apprehension Policy, but also three additional elements of proof.

    A. The first four elements of the Shoplifter Apprehension Policy:

1) Observe the subject enter the area/department before any merchandise is taken.
2) See the subject remove the merchandise from the rack or display and be able to identify the merchandise as T.J. Maxx merchandise.
3) Observe the subject conceal the merchandise or know where it is located.
4) Maintain constant, uninterrupted surveillance of the subject.

    B. Three additional elements of proof:

5) The customer must have concealed 2 or more items on his/her person (i.e. in their pocket, handbag or concealed under their clothing, etc.)
6) A clear intent to steal must exist. A clear intent to steal includes:
    a. The total concealment of the items on the person; and;
    b. An additional overt action such as the removal of price tickets, EAS tags or packaging.
7) Maintain constant uninterrupted surveillance of the subject. The subject may be detained as he/she is preparing to enter the fitting room or restroom. Do not lose sight of the subject.

(*Id.* ¶¶ 16, 18.) The detention of a customer without observing each of these elements of proof is referred to as a non-productive detainment ("NPD"). (*Id.* ¶ 19.) There are two types of NPDs. A Class 2 NPD is defined as a "failure to follow Apprehension Policies," and committing two

NPDs may result in immediate termination.  (*Id*. ¶ 20.)  On the other hand, a Class 1 NPD, which is defined as "a disregard for Apprehension policies," may result in immediate termination of employment.  (*Id*.)

In addition to her understanding of the shoplifter policies, Hall "signed an acknowledgment stating that she read, understood, and agreed to comply with T.J. Maxx's Code of Conduct," which prohibits violence in the workplace.  (*Id*. ¶¶ 12–13.)  T.J. Maxx "maintains a zero-tolerance policy prohibiting prevention detectives from making physical contact with a customer" with the only exception being where a customer physically attacks a loss prevention detective and the detective is unable to separate from the situation.  (*Id*. ¶ 24.)  In that instance, the detective may then use the least amount of force necessary to protect against injury and safely separate from the situation.  (*Id*.)

On February 26, 2011, Hall walked into T.J. Maxx at about 12:13 p.m. to begin her scheduled work shift.  (*Id*. ¶ 27.)  As she entered the store, she noticed a customer ("the customer") also walking into the store who was "empty handed."  (Pl.'s SOF ¶ 4.)  According to T.J. Maxx, however, the video surveillance shows the customer with a purse under her arm as she entered the store.  (Def.'s Resp. to Pl.'s SOF ¶ 4.)  Hall headed to the loss prevention office where, at 12:18 p.m., she turned on the monitors to begin viewing the store's video surveillance.  (Def.'s SOF ¶ 27.)  This time, Hall observed the customer with a purse, and believed that the customer had removed the purse from a store shelf.  (Hall Dep. ¶¶ 215–16.)  She admits, however, that she did not observe the customer remove the purse from a store shelf nor did she observe the customer conceal the purse.  (*Id*. ¶¶ 208:19-20 ("I didn't need concealment.  I knew where it was."), 221:16-18 (confirming that she did not see anyone conceal anything); Pl.'s Resp. to Def.'s SOF ¶¶ 29–30.)  Hall states that the Expanded Guidelines did not require that the

customer conceal two or more items on her person before a loss prevention detective could make an apprehension. (Hall Dep. 217:16-22; 221:12-14.)

At 1:15 p.m., Hall left the office, headed to the fitting rooms, and directed the customer to follow her back to the loss prevention office. (Def.'s SOF ¶ 33.) Hall then called Assistant Store Manager Robert Mazur to serve as a witness. (*Id*.) The customer said that she had purchased the purse on Overstock.com and had a receipt for the purse. (*Id*. ¶ 35.) Hall kept the customer in the office for over thirty minutes during which customer sat in a chair for most of the time while Hall reviewed video surveillance of another subject who was still in the T.J. Maxx store. (Pl.'s Resp. to Def.'s SOF ¶ 36.)

Hall admits that at one point she made physical contact with the customer. (Pl.'s SOF ¶ 15; Def.'s SOF ¶ 39.) According to Hall, the customer "jumped up" from the chair and "took a physical position of a frontal fighting stands [sic], as she made a quick movement with her right hand, upwards. I removed myself from physical contact, by placing my left hand on her chest, shifting by weight, and taking a left step." (Pl.'s SOF ¶ 15.) Hall also states that she "pushed [the customer's] center of gravity." (Pl.'s Resp. to Def.'s SOF ¶ 39.) The video shows the customer's feet rising off the ground after Hall pushed her. (Def.'s SOF ¶ 38.) According to Mazur, who witnessed Hall push the customer down in the chair, the customer was not taking an aggressive stance or physical posture toward Hall. (*Id*. ¶ 40.) Hall denies this fact by stating that Mazur's view was obstructed by Hall's body. (Pl.'s Resp. to Def.'s SOF ¶ 40.) The loss prevention office is approximately ten feet by ten feet by twelve feet. (Def.'s SOF ¶ 37.)

Hall then asked the customer to empty the contents of her purse. (*Id*. ¶ 41.) She later called Bell and showed Bell the purse in question. (*Id*. ¶ 43.) Bell determined that the purse, which was worn, stained, and dirty on the inside, was not T.J. Maxx merchandise. (*Id*.)

4

According to Bell, when he asked whether Hall observed the customer take the purse, Hall responded that she did not. (*Id*.) Bell then instructed Hall to release the customer. (*Id*.) After her release, the customer reported Hall's conduct to the Naperville Police Department. (*Id*. ¶ 44.)

Bell reported Hall's conduct to Friske, who then investigated the customer's detention by receiving and reviewing statements from Bell, Mazur, and Hall. (*Id*. ¶ 45.) Additionally, Friske and Bell reviewed the video surveillance that Hall observed—which captures the incident from when Hall and the customer entered the store through Hall's release of the customer—and prepared summaries of their initial video review. (*Id*. ¶ 48.) Based on his review of the video and Mazur's statement, Frisk determined that the customer entered the store with the purse under her arm, and that Hall made unwarranted physical contact with the customer in the loss prevention office. (*Id*. ¶¶ 50–51.)

Friske also had Regional Loss Prevention Trainer Peggy Schwingel, who has over thirty years of experience in loss prevention, to review the video surveillance. (*Id*. ¶ 52.) Schwingel determined that Hall's detainment showed a "total disregard" for T.J. Maxx's customer apprehension policies and procedures and that Hall failed to comply with the Expanded Guidelines. (*Id*. ¶ 53.)

Based on the results of his investigation, Friske determined that Hall: (1) committed a Class 1 "gross violation" of T.J. Maxx's loss prevention policies and (2) made unwarranted physical contact with the customer. (*Id*. ¶¶ 55–56.) Either of these reasons provided independent grounds to terminate Hall, according to Friske. (*Id*. ¶ 56.) Friske, with Bell and Schwingel's concurrence, then made the decision to terminate Hall's employment. (*Id*. ¶ 53.)

5

According to Hall, Bell was the only T.J. Maxx employee who discriminated against her. (Pl.'s Resp. to Def.'s SOF ¶ 58.) Hall states that the only time in which she recalled Bell making a comment about her sexual orientation was when in response to Hall asking Bell whether Store Manager Cheryl Brown had a problem with her, Bell speculated that Brown might be homophobic. (*Id.* ¶ 59; Hall Dep. 187:16–18, 188:1–22; Bell Dep. 127:21–24.)[2] Hall admits that no one else at T.J. Maxx commented on her sexual orientation. (Pl.'s Resp. to Def.'s SOF ¶ 59; Hall Dep. 188:1–22.)

Hall also states that she experienced payroll inaccuracies due to her transfer from California to Illinois and that "you could only make a mistake so many times, but when are you consistently doing it, I believe it was done intentionally." (Hall Dep. 122:11–13, 128:1–3.) Lastly, Hall states that she was previously discriminated against when T.J. Maxx determined that she made a Class 2 NPD on December 11, 2010. (Pl.'s Resp. to Def.'s SOF ¶ 73.) According to T.J. Maxx, however, Hall failed to observe each of the necessary elements of proof for a customer apprehension. (Def.'s SOF ¶ 74.)

The only other loss prevention detective supervised by Bell who committed an NPD is Adrian Chavez, who committed a Class 2 NPD detainment and did not physically touch the customer whom he stopped. (*Id.* ¶ 57; Pl.'s SOF ¶ 18.) Hall states that Yannis Reglis also committed an NPD violation but offers no evidence to support this fact. (Pl.'s SOF ¶ 20; Pl.'s Resp. to Def.'s SOF ¶ 57.)

---

[2] On January 8, 2011, Brown requested that Hall be sent home from a DeKalb T.J. Maxx store inventory because Hall "was trying to tell [Brown] how to run her inventory." (Def.'s SOF ¶ 76.) Bell also told Hall to leave the DeKalb store and return to the Naperville store. (*Id.*) According to Hall, Bell claimed that Hall was ordered to leave "because a associate felt uncomfortable with Plaintiff, states how do I know, maybe 'she's a homophob.'" (Pl.'s Resp. to Def.'s SOF ¶ 76; Pl.'s SOF ¶ 23.)

On June 28, 2011, Plaintiff filed a charge of discrimination against T.J. Maxx with the Illinois Department of Human Rights ("IDHR"), in which she alleged that T.J. Maxx terminated her employment on the basis of her sex and sexual orientation. (Def.'s SOF ¶ 5.) On July 3, 2012, the IDHR dismissed Hall's charge and notified her of her right to sue. (*Id*. ¶ 6.) Hall filed this action in November 2012. Throughout this opinion, we take into account that Hall is *pro se*.

## STANDARD OF REVIEW

Summary judgment will be granted in favor of the moving party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552 (1986). When ruling on a motion for summary judgment, we must view evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Montgomery v. Am. Airlines, Inc*., 626 F.3d 382, 389 (7th Cir. 2010). Further, disputed facts that are not outcome-determinative are not material and will not preclude summary judgment. *Montgomery*, 626 F.3d at 389; *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). If and only if a reasonable jury could not return a verdict for the nonmovant, is summary judgment warranted. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

## DISCUSSION

We analyze Hall's IHRA claims under the same legal framework as Title VII claims. *See, e.g., Teruggi v. CIT Group/Capital Finance, Inc*., 709 F.3d 654, 659 (7th Cir. 2013) (analyzing federal discrimination claims and IHRA claims together under the same analytical framework). Hall may establish that T.J. Maxx violated IHRA's antidiscrimination provisions

7

through one of two ways: (1) by direct evidence; and (2) by the indirect burden-shifting approach. *Id.* at 659; *Montgomery*, 626 F.3d at 394.

   **A. The direct method of proof**

In her response, Hall fails to address T.J. Maxx's assertion that she has no direct evidence of discrimination. (Mem. at 13–14; Resp. at 1–7.) Although we take into account Hall's *pro se* status, "it is not the obligation of [the] court to research and construct the legal arguments open to the parties . . ." *330 W. Hubbard Rest. Corp. v. United States*, 203 F.3d 990, 997 (7th Cir. 2000). Other judges in this circuit have found that a party's failure to address, or adequately develop, an argument based on the direct method of proof results in the waiver of that argument. *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) ("A single sentence that mentions a theory of direct proof . . . is not enough to preserve the issue . . . ."); *Colabuono v. Tri-Star Cabinet & Top Co., Inc.*, No. 09 CV 1961, 2010 WL 3700840, at *3 (N.D. Ill. Sept. 8, 2010) (finding in a discrimination case that plaintiff waived argument based on the direct method when his summary judgment response contained only a "single sentence . . . in support of the direct method of proof").

Here, Hall does not include even a single sentence in her response regarding a theory of direct proof. The fact that she twice mentions the direct method—albeit in a brief, unsupported, and conclusory fashion—in her response to T.J. Maxx's Rule 56.1 statement does not save her. Legal arguments must be expressed in the party's brief. *See BP Amoco Chem. Co. v. Flint Hills Resources, LLC*, 615 F.3d 765, 777 (N.D. Ill. 2009). Hall's failure to address, in any way, the

direct method in her response to T.J. Maxx's motion for summary judgment amounts to a waiver of this argument. Accordingly, we proceed with the analysis of the indirect approach.[3]

**B. The indirect method of proof**

Under the indirect method of proof, the plaintiff bears the burden of establishing a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) her job performance met her employer's legitimate expectations; (3) she was subjected to a materially adverse employment action; and (4) the employer treated similarly-situated employees outside of the plaintiff's protected class more favorably. *Montgomery*, 626 F.3d at 394. Only if the plaintiff establishes these elements does the burden shift to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Id*. If the defendant satisfies that minimal showing, the burden shifts back to the plaintiff, who must then prove that the defendant's explanation is a pretext for discrimination. *Id*.

**1. Hall failed to satisfy T.J. Maxx's legitimate expectations of her job**

**a. Hall violated T.J. Maxx's shoplifter policies**

T.J. Maxx argues that Hall failed to meet its legitimate expectations "when she wrongly detained and assaulted a T.J. Maxx customer on February 26, 2011." (Mem. at 4.) The parties do not dispute that T.J. Maxx's expectations of Hall's job performance in accordance with its Shoplifter Apprehension Policy and Expanded Shoplifting Guidelines were legitimate. (*Id*. at 4–9, Resp. at 3–4.) T.J. Maxx expected Hall, as a loss prevention detective, to abide by these policies. Under the Expanded Shoplifting Guidelines, Hall was certified to apprehend customers who concealed merchandise before they entered a restroom or dressing room. Before

---

[3] For the record, the undisputed facts show that Hall has not met her burden under the direct method since there is no evidence that any of T.J. Maxx's employees discriminated against her.

apprehending a customer, however, she was required to meet the first four elements of the Shoplifter Apprehension Policy as well as three additional elements of proof. (*See* supra p. 2.)

The evidence shows that Hall did not meet all of the requirements before apprehending the customer. First, Hall admits that she did not observe the customer remove the purse from the store shelf, which put her in violation of T.J. Maxx's policy number (2): "See the subject remove the merchandise from the rack or display and be able to identify the merchandise as T.J. Maxx merchandise." (Def.'s SOF ¶ 16.) Second, Hall admits that she did not observe the customer conceal two or more items, thus putting her in violation of T.J. Maxx's policy numbers (3): "Observe the subject conceal the merchandise or know where it is located," and (6)(a): "A clear intent to steal must exist. A clear intent to steal includes: (a) The total concealment of the items on the person; and (b) An additional overt action such as the removal of price tickets, EAS tags or packaging." (*Id.* ¶ 16.) In fact, she did not see the customer conceal even one item.

Next, it is undisputed that Hall made contact with the customer. T.J. Maxx's policies prohibit any unwarranted physical contact with a customer; such contact is grounds for immediate termination. Hall admits that she pushed the customer into the chair, but contends that it was warranted because the customer took a "frontal fighting stands [sic]" and made a "quick movement with her right hand." (Resp. at 4.) Assistant Manager Mazur, however, who was standing just feet away from the customer and observed Hall push the customer down in the chair, stated that the physical contact was unwarranted because the customer was not behaving in a manner that could be considered threatening to Hall. (Def.'s SOF ¶¶ 40, 47.) The act of making unwarranted physical contact with a customer provided a second and independent reason for T.J. Maxx to terminate Hall. *Sawyer v. Columbia College*, 864 F. Supp. 2d 709, 718 (N.D. Ill. 2012) (plaintiff's admission that he physically pushed someone at work meant he was not

meeting employer's legitimate job expectations; "[e]ven if the exact details are in dispute, Plaintiff does not dispute that he . . . pushed" the other person "off of him"). There is no genuine issue of material fact that Hall's physical contact with the customer was unjustified, and that it provided independent grounds for her termination.

### 2. Bell's bias

Hall argues that "T.J. Maxx is Liable for Michael Friske the decision-maker's action, based on a 'singular influence' of a bias [sic] employee, David Bell." (Resp. at 2.) According to Hall, District Loss Prevention Manager Bell "supplied misinformation and failed to supply the relevant information that caused the plaintiff harm;" Regional Loss Prevention Manager Friske "only regarded the 'singular influence' of, David Bell, during his investigation;" and Regional Loss Prevention Trainer Schwingel "never looked over any of the documentation." (*Id*. at 3.)

This theory, otherwise known as the "cat's paw" theory "requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson v. Koppers*, 726 F.3d 910, 914 (7th Cir. 2013). Here, Hall has offered evidence of neither. First, she has not presented any evidence that Bell harbored bias. The only evidence of bias that Hall presents is a comment that Bell allegedly made in which he speculated that *another employee* may be a "homophobe." (Pl.'s Resp to Def.'s Facts ¶ 59.)

Second, even if Hall had offered evidence of Bell's bias, there is no evidence to indicate that it was the proximate cause of her termination. The undisputed facts show that Friske, Bell, and Schwingel each independently reviewed the video from February 26, 2011, and determined that Hall violated the loss prevention policies. Friske determined that Hall committed a "gross

11

violation" of T.J. Maxx loss prevention policies. (Def.'s SOF ¶ 55.) Schwingel determined that Hall showed a "total disregard" for T.J. Maxx's policies. (*Id.* ¶ 53.) And Mazur provided Friske with a written statement confirming that he observed Hall shove the customer. (*Id.* ¶ 40.) Thus, regardless of whether Bell harbored any bias against Hall, there were independent grounds upon which these individuals based their determination that Hall had violated T.J. Maxx's policies. Hall's cat's paw theory thus fails. S*ee Johnson*, 726 F.3d at 915 (granting summary judgment and rejecting cat's paw argument where plaintiff "provided no evidence to indicate that [the subordinate's] animosity was motivated by discriminatory bias against her race or gender" and where the proximate cause of plaintiff's termination was a "physical altercation . . . that was witnessed by an independent third party").

For the reasons discussed above, no reasonable trier of fact could find that Hall met T.J. Maxx's legitimate job expectations.

**B. Hall fails to identify any similarly-situated employees**

To establish her *prima facie* case, Hall must identify a similarly-situated employee outside of her protected class whom T.J. Maxx treated more favorably. *Montgomery*, 626 F.3d at 394. Coworkers are "similarly situated," if "the putative similarly situated employees were directly comparable to the plaintiff in all material respects." *Id.* at 395 (quotations omitted). A plaintiff must show that she and an alleged comparator "engaged in similar conduct without such different or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Hanners v. Trent*, 674 F.3d 683, 692–93 (7th Cir. 2012) (quotations omitted); *see also Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2004) (finding that a *prima facie* case was not met where a terminated employee could not show a coworker with a "comparable set of failings").

T.J. Maxx argues that Hall cannot show that there was a similarly-situated employee. (Mem. at 9.) In her response, Hall counters this argument by pointing to other employees, Yannis Reglis and Adrian Chavez, who are not in her protected class, who violated T.J. Maxx's policies, and who were not terminated. (Resp. at 5; Pl.'s SOF ¶¶ 18–20.) Stating merely that these individuals acquired NPD violations, however, does not establish that they are "directly comparable to [Hall] in all material respects." First, the evidence does not indicate that Reglis ever conducted an NPD. (Def.'s SOF ¶ 57.) Even if Reglis had committed received an NPD violation, Hall fails to argue how it was similar to her own Class 1 NPD. Second, there are no facts to indicate that Reglis made unwarranted physical contact with a customer.

With regard to Chavez, the facts do not indicate that he was similarly situated either. First, Hall fails to show how Chavez's NPD record is comparable to her own. (Resp. at 5.) It is undisputed that Chavez committed a Class 2 NPD. Second, Chavez did not make physical contact with a customer. Hall, on the other hand, committed a Class 1 NPD, failed to satisfy several elements of proof, and pushed the customer into a chair.

Neither Reglis nor Chavez are "directly comparable in all material respects" to Hall. *Montgomery*, 626 F.3d at 395; *see also Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (coworkers who also violated company policies were not similarly situated to plaintiff, as they did not violate policies "with the same reckless abandon" as did plaintiff). Because Reglis and Chavez did not, like Hall, committed a Class 1 NPD, under which T.J. Maxx's policies mandate immediate termination, nor did they make unwarranted physical contact with a customer, no reasonable trier of fact could find that Reglis and Chavez were similarly situated. Accordingly, Hall has failed to establish this element of her *prima facie* case of discrimination.

In sum, no reasonable trier of fact could find that Hall satisfied the second and fourth prongs of her *prima facie* case. First, they could not find that Hall satisfied T.J. Maxx's legitimate expectations of her job. The undisputed facts show that T.J. Maxx's reasons for terminating Hall were based on: (1) her failure to abide by the elements of proof necessary for detaining a T.J. Maxx customer; and (2) because she physically assaulted a customer. Second, no reasonable trier of fact could find that Hall identified similarly-situated employees. Because Hall has not established a *prima facie* case of discrimination, we need not discuss whether T.J. Maxx's reasons for terminating Hall were pretext for discrimination.

## CONCLUSION

No reasonable trier of fact could find that T.J. Maxx terminated Hall based on her gender and sexual orientation. We therefore grant T.J. Maxx's motion for summary judgment. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: Chicago, Illinois
August 6, 2014